**Joan MITTIGA and Roy Mittiga, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 94–CV–1586.

United States District Court, N.D. New York.

Nov. 25, 1996.

Poissant & Nichols, P.C., Malone, NY (Thomas A. Grue, of counsel), for Plaintiffs.

Thomas J. Maroney, United States Attorney, N.D. New York, Syracuse, NY (Paula Ryan Conan, Asst. U.S. Atty., of counsel), for Defendant United States.

**MEMORANDUM, DECISION AND ORDER**

McAVOY, Chief Judge.

## I. Background:

This action seeking damages for personal injuries under the Federal Tort Claims Act, 28 U.S.C. 2671 *et seq.*, came before the Court for a bench trial on October 9, 1996. Plaintiff's cause of action stems from the October 7, 1992 motor vehicle/pedestrian accident that occurred in Massena, New York, between an automobile owned by the United States Coast Guard and operated by Petty Officer Christopher Stevenson, an employee of same, and plaintiff Joan Mittiga, a pedestrian crossing the street. The Court now makes the following findings of fact and conclusions of law as a result of the evidence at trial. For purposes of clarity, the Court has set forth separate findings of fact and conclusions of law with respect to liability (section II) and damages (section III).

## II. Liability

### A. Findings of Fact:

1). October 7, 1992, was a clear and sunny Autumn day in Massena, New York, where Petty Officer Christopher Stevenson was a member of the United States Coast Guard, assigned to the Marine Safety Detachment, Foreign Vessel Inspection at the St. Lawrence Seaway Development Corporation. He had been assigned there for just over a year at time of the accident. At that time, and at the office where Mr. Stevenson was employed, the Coast Guard owned a 1991 Dodge Caravan. Mr. Stevenson had used the vehicle before. At the time of the accident, he was using the vehicle as part of his duties and with the permission of the United States.

2). Main Street in Massena is a two-lane, north-south public street with one lane designated for travel in each direction. There is room for cars to parallel park on either side of the street, although none were so parked in the vicinity of the accident on the day in question. To the south of the site of the accident, Main Street is intersected by New

York State Route 37, a four-lane highway running east-west.

3). At approximately 1:00 p.m., Mr. Stevenson left his office at the St. Lawrence Seaway Development Corporation to pick up the mail at the post office on Main Street in Massena. His trip eventually led him onto Route 37 traveling East. Since the Post Office was on Main Street north of Route 37, he would be making a left turn onto Main.

4). In the meantime, plaintiff Joan Mittiga was at work at the First National Bank of Northern New York ("the bank"), located at 264 Main Street on the west side of the street. Mrs. Mittiga is a 68 year-old female, who at the time of the accident was employed as a new accounts clerk at the bank. She had plans to meet some friends for lunch at Pizza Hut, located on the east side of Main Street, on the southeast corner of Bowers Street and Main Street. Bowers Street intersects and ends at Main from the east; the intersection is approximately four hundred feet south of the bank; the Route 37 intersection is farther south.

5). Mrs. Mittiga punched out for lunch at 1:10 p.m. She walked out the front door of the bank, which faces Main Street, and walked down the front walk of the bank, heading east toward the western curb of Main Street.

6). While on the front walk of the bank, which runs perpendicular to Main Street, Mrs. Mittiga did not look to her right or left. When she reached the sidewalk in front of the bank, which runs parallel to Main Street, she did not look to her right or left.

7). When she reached the strip of grass between the parallel sidewalk and the street, Mrs. Mittiga looked to her right and left to check for traffic on Main Street. She recalled seeing cars approaching from the north, approximately one and one-half blocks away. Looking to the south, she could see all the way to the Route 37 intersection, and recalls seeing no northbound traffic. She then proceeded to cross the street.

8). There was no crosswalk present where Mrs. Mittiga crossed Main Street. The nearest crosswalk was to the south, at the traffic light where Main Street intersected with Route 37.

9). At some point in this time frame, Mr. Stevenson was making his left turn from Route 37 onto Main Street. He testified that he had driven on Main Street "countless times," and was familiar with the route. As he turned left, he could see all the way up Main Street to the area of the bank.

10). Mr. Stevenson testified that he did not see any vehicles in front of him as he turned onto Main Street, nor any southbound traffic. He did not see any pedestrians crossing the street as he made the turn. Mr. Stevenson testified, and the Court finds credible, that his speed was consistently 20–25 m.p.h. at all relevant times.

11). As he traveled north on Main Street, Mr. Stevenson glanced briefly to the right to look at the house of an acquaintance of his. The house in question, located on the east side of Main Street, was across the street from the bank and slightly south. Mr. Stevenson testified that he was checking to see if his friend's car was in the driveway, with the intention of calling her later if she was home. Mr. Stevenson characterized the glance as spontaneous and unpremeditated. The Court finds this testimony credible.

12). At the moment Mr. Stevenson was looking back from his glance to the right, he heard a "thud." The right front corner of his vehicle struck Mrs. Mittiga as she was crossing Main Street. The weight of the credible evidence shows that Mrs. Mittiga was approximately 5–8 feet from the east curb of Main Street at the time she was struck.

13). Given Mr. Stevenson's testimony, which the Court finds credible, the Court adopts as a finding of fact that Mr. Stevenson's attention was momentarily diverted from the road in front of him just prior to the point that the van struck Mrs. Mittiga. Thus, Mr. Stevenson never saw Mrs. Mittiga before the van struck her. Mr. Stevenson essentially testified to the same, and witnesses William Wilson and Beatrice Hampton both testified that Mr. Stevenson did not slow down or take evasive action before the van struck Mrs. Mittiga. Nor did Mr. Stevenson apply the brakes or sound his horn.

14). Given Mrs. Mittiga's testimony, which the Court also finds credible, the Court adopts as a finding of fact that Mrs. Mittiga never saw the van before it hit her. She looked both ways when she was on the strip of grass at the west curb of Main Street, and did not look both ways again. Witnesses William Wilson and Ruth Trimm both testified that Mrs. Mittiga crossed the street with her head forward and down, as if looking where she was going. Witness Beatrice Hampton testified that Mrs. Mittiga did look to the right when she was in the middle of the street, but the Court adopts as its finding the more likely scenario that Mrs. Mittiga never saw the van.

## B. Conclusions of Law

■ 1). The Court concludes that the findings of fact made above, particularly those facts found in ¶ 13, *supra*, establish that the United States, through its employee Christopher Stevenson, breached to plaintiff its duty to operate a motor vehicle with reasonable care under New York statutory and common law. *See Lo Giudice v. Riedel*, 32 A.D.2d 950, 303 N.Y.S.2d 756 (2d Dep't 1969); *Linton v. Forman Family, Inc.*, 215 N.Y.S.2d 878 (Sup.Ct. Kings County 1961); N.Y. Vehicle and Traffic Law § 1146 (McKinney 1986) ("... every driver of a vehicle shall exercise due care to avoid colliding with any ... pedestrian ... upon any roadway ...").

2). The Court further concludes that the findings of fact made above, particularly those facts found in ¶ 14, *supra*, establish that plaintiff also failed to act with the reasonable care and prudence dictated by her crossing of Main Street at a point other than a crosswalk. *See* New York Vehicle and Traffic Law § 1152(a).

> A pedestrian who crosses a street at a place where there is no regular crossing may be chargeable with some additional vigilance because it is not a place set aside for the crossing of foot passengers, although even at such place drivers are required to be watchful and careful.

*Hogeboom v. Protts*, 30 A.D.2d 618, 290 N.Y.S.2d 437, 440 (3d Dep't 1968) (quoting *Baker v. Close*, 204 N.Y. 92, 95, 97 N.E. 501 (1912)).

■ 3). The Court further concludes that defendant United States' negligence was 60% responsible for proximately causing the collision in question. Therefore, the United States is liable for 60% of the total of damages sustained by plaintiff as a result of the collision. It follows that the proportion of plaintiff's culpable conduct renders her 40% liable for proximately causing the collision and the damages to her which flowed therefrom. Therefore, the damages otherwise recoverable by plaintiff must be reduced by 40%. *See* N.Y.Civ.Prac.L. & R. § 1411 (McKinney 1994); *Arbegast v. Board of Education*, 65 N.Y.2d 161, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985). The percentage of fault attributed to Mrs. Mittiga must also be applied to reduce any award on Roy Mittiga's derivative action. *See Hagler v. Consol. Edison Co. of New York*, 99 A.D.2d 725, 472 N.Y.S.2d 340, 341 (1st Dep't 1984).

## III. Damages

### A. Findings of Fact

### i). Plaintiff's Pain and Suffering

■ 1). When she was struck, Mrs. Mittiga was thrown to the ground close to the east curb of Main Street. Mrs. Mittiga testified that at some point, she found herself lying on the ground in excruciating pain, with her leg and arm folded under her. Several pedestrians then came to her assistance, and an ambulance was called. Mrs. Mittiga was taken to Massena Memorial Hospital.

2). X-rays taken at the hospital revealed that Mrs. Mittiga had suffered an undisplaced fracture of the right ilium involving the medial and also the anterior aspect of the ilium; a fracture involving the superior ramus on the left side; and a fracture involving the posterior aspect of the right acetabulum. She also suffered a right colles fracture, a fractured tooth and lost part of the bridge on another tooth.

3). Later that day, Mrs. Mittiga was taken to Fletcher Allen Memorial Hospital in Burlington, Vermont. She testified that her first day there, she was still experiencing terrible pain in her hip and arm. She was

kept in traction at the hospital for most of her stay. A plaster cast was also placed upon her right arm for the Colles fracture, extending from her knuckles to above her elbow.

4). Mrs. Mittiga was released from the hospital on October 22, 1992. She testified that she was still in pain, though the medication she had been prescribed helped. Once she returned home, Mrs. Mittiga remained in bed most of the time; after approximately two weeks, however, she was able to sit in a wheelchair. She was still experiencing some pain in her back and right hip. Her right arm, encased in the plaster cast, hurt severely a few days after returning home, and her skin was becoming irritated. She thus consulted Dr. Bedros Bakirtzian, her treating physician, whose videotaped deposition the Court received into evidence. Dr. Bakirtzian testified that on October 30, 1992, he replaced the cast with one extending below the elbow, freeing the area of irritation.

Approximately one month after returning home from the hospital, Mrs. Mittiga began walking around the house with the assistance of a walker. Sometime after Christmas, she first went outside. In mid-January of 1993, she was able to go to the shopping mall with her husband, who would push her in the wheelchair. Mrs. Mittiga still had to use the walker, as well as a pair of crutches, to get into and out of the house.

Beginning in March of 1993, and continuing through October of 1993, Mrs. Mittiga underwent therapy three times per week at Seaway Orthopedics. Through the summer of 1993, she was walking outside with no assistance. She was able to do light housework in the Fall of 1993.

5). Mrs. Mittiga testified that prior to the accident, her health was good, though she had high blood pressure and cholesterol, for which she took medication. Her normal activities before the accident included walking five to six miles per day with her friends; doing housework; and helping her elderly mother. Since the accident, Mrs. Mittiga has been able to walk only two blocks at time before the pain in her hip returns.

Mrs. Mittiga testified that she no longer has any regular pain, and sometimes has two or three pain-free days in a row. Based upon her own testimony, and that of Dr. Bakirtzian, the Court finds that Mrs. Mittiga has experienced a considerable amount of pain in her hip, right buttock, right thigh, and arm.

Based upon the testimony of Dr. Bakirtzian, including his diagnosis of Mrs. Mittiga as suffering from chronic trochanteric bursitis, and the likelihood of ongoing problems with her right hip, the Court adopts as a finding of fact that Mrs. Mittiga will continue to suffer some intermittent pain in the future as a result of the accident.

■ 6). Dr. Bakirtzian testified that the progressive condition of Mrs. Mittiga's arthritic hip might lead to the necessity of a hip replacement. The Court finds, however, that Dr. Bakirtzian's testimony on this matter was speculative at best. Initially, he spoke in somewhat general, hypothetical terms, noting that

> [t]he natural course of osteoarthritis of the hip is one of progressive pain, limitation of motion, and discomfort, which will eventually, if the process continues, end—a patient will end up with a total hip replacement.

(Bakirtzian Dep. at 71). When asked if he had an opinion to a reasonable degree of medical certainty as to whether Mrs. Mittiga's injuries would cause her a degree of permanent disability, Dr. Bakirtzian responded that "I think her right hip will progressively get worse with osteoarthritic changes. *She might require a hip replacement.*" (Bakirtzian Dep. at 100 (emphasis added)). Such testimony is far too speculative to establish a factual determination that such a replacement will be necessary.

### ii). Mrs. Mittiga's Economic Loss

1). Upon submission of plaintiff's certified medical records, which the Court has reviewed, the Court adopts as a finding of fact that the medical expenses incurred by Mrs. Mittiga as a result of this accident total $27,923.27.

2). Mrs. Mittiga testified at trial as to her employment with the bank. She testified that the day of her accident was her third day on the job at the bank. She planned to work full time for approximately two months, after which she would cut back her hours to 12–15 per week.

3). Mrs. Mittiga's salary at the bank was $8.00 per hour.

4). Mrs. Mittiga testified on direct examination that returning to work after her recovery essentially would be futile because she was still experiencing intermittent pain, and would have to call in sick too often. On cross-examination, however, defendant pointed out that she had testified at her deposition that she would forget about returning to work and simply enjoy her retirement.

### iii). Mr. Mittiga's Damages

1). Mr. Mittiga testified that during the entire period of his wife's initial convalescence, he did all the cooking. Prior to the accident, Mrs. Mittiga was the primary gastronome in the household.

2). Mr. Mittiga testified that his relationship with his wife is no longer the same. Before the accident, they traveled more, went dancing more, and were generally more active together. He testified that for a period following the accident, he could not hug his wife.

3). Mr. Mittiga further testified that prior to the accident, his wife would do most of the canning and vacuuming, which Mr. Mittiga had to do while he wife was recovering, and which he still does.

4). Mrs. Mittiga agreed that her relationship with her husband has suffered as a result of the accident. She testified that her physical condition affected the couple's intimate relations, due in part to her decreased mobility.

### B. Conclusions of Law

1). The parties stipulated at trial that both Mrs. Mittiga and defendant are "covered persons" within the meaning of N.Y. Insurance Law § 5102(j). Therefore, plaintiff may recover economic losses only to the extent such losses exceed $50,000. *See*

N.Y.Ins.Law § 5102(a) (defining "basic economic loss" as up to fifty thousand dollars per person of medical expenses, loss of earnings, etc.); § 5104(a) (stating that in action involving covered person versus covered person, no recovery for basic economic loss).

2). Mrs. Mittiga has not suffered economic loss beyond "basis economic loss" as defined in N.Y.Ins.Law § 5102. Mrs. Mittiga's medical expenses total $27,923.27. Assuming, *arguendo*, that Mrs. Mittiga was willing but unable to return to work as a result of her injuries, her income for the three year period provided in § 5102(a)(2), at $8.00 per hour, fifteen hours per week, fifty weeks per year, would total no more than $18,000. Thus, Mrs. Mittiga's total economic losses are within the "basic economic loss" threshold and are not recoverable under § 5104. *See Goodkin v. U.S.,* 773 F.2d 19, 22 (2d Cir.1985); *Patrello v. United States,* 757 F.Supp. 216, 219 (S.D.N.Y.1991).

3). The injuries sustained by Mrs. Mittiga as a result of the accident constitute "serious injur[ies]" within the meaning of N.Y.Ins. Law § 5102(d). That section defines serious injuries to include fractures. *See id.* Thus, Mrs. Mittiga may recover her non-economic losses, i.e., pain and suffering. N.Y.Ins.Law § 5104(a) ("there shall be no right of recovery for non-economic loss, except in the case of a serious injury"); *see also State–Wide Ins. Co. v. Buffalo Ins. Co.,* 105 A.D.2d 315, 483 N.Y.S.2d 393, 400 (2d Dep't 1984) (noting that covered person may collect non-economic loss from covered person in negligence action provided "serious injury" is sustained). Defendant concedes as much in its pre-trial brief. (See Govt.'s Trial Mem. at 16 ("In view of Mrs. Mittiga's conceded 'serious injury' as defined by statute . . . she is entitled to seek recovery for her 'non-economic losses' . . .")).

4). The Court finds that in light of all the evidence, plaintiff Joan Mittiga has been damaged in the amount of $200,000. The Court's calculation constitutes a fair and just compensation for all the injuries, pain and suffering plaintiff has endured, which are the natural and proximate consequences of the collision described, as found above in findings

of fact, II(A)(i)(1)–(5). *See 26 N.Y.Jur.2d, Damages §§ 56–66 (1984 & 1994 Supp.).*

5). Reducing those damages by plaintiff's negligence which contributed 40% to proximately causing this accident, the Court hereby concludes that plaintiff Joan Mittiga should recover from defendant United States a total of $120,000 for damages suffered as a result of the collision.

■ 6). Mr. Mittiga's loss of consortium claim "embraces such elements as love, companionship, affection, society, sexual relations, solace and more." *Millington v. Southeastern Elevator Company,* 22 N.Y.2d 498, 502, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897 (1968). Based upon the findings of fact in section II(A)(iii), *supra,* the Court finds that Roy Mittiga has been damaged in the amount of $20,000. Reducing those damages by plaintiff Joan Mittiga's comparative negligence, *see Hagler v. Consol. Edison Co. of New York,* 99 A.D.2d 725, 472 N.Y.S.2d 340, 341 (1st Dep't 1984), the Court hereby concludes that plaintiff Roy Mittiga should recover from defendant United States $12,000.

## IV. Conclusion:

Based on the foregoing findings of fact and conclusions of law the Court finds that judgment should be entered for plaintiffs in the amount of **$132,000.**

**IT IS SO ORDERED.**